## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HARRY BECKETT,** | : | **CIVIL NO. 1:CV-10-0050** |
| | : | |
| **Plaintiff** | : | **(Judge Rambo)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEPARTMENT OF** | : | |
| **CORRECTIONS,** *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Plaintiff Harry L. Beckett, an inmate currently incarcerated at the State

Correctional Institution in Huntingdon, Pennsylvania ("SCI-Huntingdon"),

commenced this action on January 11, 2010, by filing a complaint pursuant to the

provisions of 42 U.S.C. § 1983, followed by an amended complaint filed on

December 8, 2010. (Doc. 70.) Plaintiff alleges that certain medical staff,

(collectively, "Medical Defendants"),[1] as well as a number of Department of

Corrections ("DOC") employees,[2] violated his constitutional rights and committed a

---

[1] The Medical Defendants are as follows: Angela Auman, Physician Assistant ("PA"); Dawn Mills, PA; and, Olga Beresgouskava, M.D. In a memorandum and order issued on October 12, 2011, addressing previously-filed motions to dismiss, former defendant Prison Health Services was dismissed and terminated as a defendant in this action. (*See* Doc. 106.)

[2] The DOC Defendants are as follows: Mary L. Showalter, SCI-Huntingdon Health Care Administrator; Lynn Albright, Nurse; and William Randolph, Nurse. In the memorandum and order issued on October 12, 2011, addressing previously-filed motions to dismiss, former defendants DOC and "John/Jane Doe, Unknown Employees of Pennsylvania Department of Corrections" were dismissed and terminated as defendants in this action. (*See* Doc. 106.)

number of pendant state law violations when they failed to properly treat his chronic medical condition.

Presently before the court are separate motions for summary judgment, filed by Medical Defendants and DOC Defendants, respectively.  (Docs. 148 & 167.)  For the following reasons, the motions for summary judgment will be granted.

## I.   __Background__

The following facts are related to Plaintiff's claims.  The court notes any factual disputes between the parties by presenting both parties' contentions.

In his amended complaint, Plaintiff alleges that he was denied medical treatment in the form of medical showers and a cane.  (Doc. 150 ¶ 2; Doc. 169 ¶ 2; *see also* Doc. 70.)  These allegations regarding medical care date back to 1996.  (Doc. 150 ¶ 3; Doc. 169 ¶ 6.)  In his deposition taken in connection with this action, Plaintiff stated that he could have filed this lawsuit in the 1990's, but did not do so because his medical showers were always reinstated.  (*See* Doc. 150 ¶ 4; Doc. 169 ¶ 7; Doc. 175 ¶ 4; Doc. 177 ¶ 7; *see also* Doc. 164-1, Ex. 42, Pl. Dep.)

In their statement of facts, Medical Defendants Beregovskaya, Auman, and Mills assert that while Plaintiff claims that each of them interfered with his medical showers from 1996 to the present, they were only at SCI-Huntingdon for portions of

that time period.  (Doc. 150 ¶ 5.)  Defendant Beregovskaya was at SCI-Huntingdon from December 2003 to October 2006, and Defendant Auman was there from January 2004 until July 2008.  (*Id*. ¶ 6.)  Further, Defendant Mills started at SCI-Huntingdon in 1998, but left at some point for employment at SCI-Smithfield.  (*Id*. ¶ 7; Doc. 164-2, Ex. 43, Mills Dep.)

In DOC Defendants' statement of facts, Defendant Showalter asserts the following.  Plaintiff claims in his amended complaint that Defendant Showalter was the person in SCI-Huntingdon's medical department responsible for signing off on and approving medical treatment and that she failed to ensure his continuity of care with respect to his medical issues.  (Doc. 169 ¶ 3.)  In her role as Health Care Administrator, Defendant Showalter was the administrator responsible for overseeing the operations of the medical department at SCI-Huntingdon.  (*Id*. ¶ 4.)  In this role, Defendant Showalter did not have authority to order physician's assistants or treating physicians to alter or rescind medical orders unless those orders impaired institutional security.  (*Id*. ¶ 5.)

Further, DOC Defendants assert that, with respect to Defendants Randolph and Albright, Plaintiff's claims are based on a November 4, 2006 incident in which they responded to Plaintiff's complaints of a medical emergency and subsequently issued

3

him a prison misconduct for his actions.  (*Id*. ¶ 8.)  Plaintiff does not dispute this fact, but further recounts the November 4, 2006 incident and notes that the claims against these Defendants are "largely" based on it.[3]  (Doc. 177 ¶ 8.)

## A.    <u>Facts Relating to Medical History</u>

Plaintiff has a history of Reflex Sympathetic Dystrophy ("RSD"), also known as Complex Regional Pain Syndrome ("CRPS"), which developed prior to Plaintiff's incarceration.  (Doc. 150 ¶¶ 8, 9; Doc. 169 ¶¶ 11, 12.)  During his incarceration, Plaintiff has been seen and monitored for a variety of conditions, including RSD and CRPS, by prison medical staff and outside specialists.  (Doc. 150 ¶ 11; Doc. 169 ¶ 13.)  There are over three hundred (300) physician's orders in his chart from March 1996 through October 24, 2011, and hundreds of progress notes from October 1997 through October 2011.  (Doc. 150 ¶ 12; Doc. 169 ¶ 14.)

---

[3]  Plaintiff's counter statement of material fact here is as follows:

With respect to Defendants Randolph and Albright, Plaintiff's claims are largely based upon a November 4, 2006 incident in which they responded to a call to B Block with report of "man down, having a seizure."  PA Albright noted probable manipulation/malingering and issued Plaintiff a subsequent misconduct for his actions.  Although the same Progress Note states "inmate told numerous times to sign up for sick call," when Plaintiff went to medical on November 3, 2006, stating "I need help real bad," he was told to return to his cell.  On the Progress Note, medical staff wrote: "he wanted to see MD today - not going to happen - he's already scheduled for next week."  (Doc. 154-1, Ex. 3, Progress Notes, p. 81-82.)

(Doc. 177 ¶ 8.)

In the treatment for his RSD, Plaintiff has been prescribed medical showers by a neurologist.  (Doc. 177 ¶ 21.)  Medical showers are for those who typically have trouble ambulating and, thus, take longer to get in and out of the showers, which are timed.  (Doc. 150 ¶ 13 n.3; Doc. 169 ¶ 21.)  When an inmate is prescribed a medical shower, medical staff notify the inmate's unit team of the doctor's order.  (Doc. 175 ¶ 13; Doc. 177 ¶ 15.)  Therefore, it is non-medical staff, including the unit team and corrections officers in the inmate's housing unit, who oversee the medical showers. (Doc. 150 ¶ 13; Doc. 169 ¶ 15.)

The record of Plaintiff's treatment for his RSD, including the prescription of medical showers, also known as "hot" showers, is as follows.  On July 3, 1996, Dr. Mangino ordered a 15-minute medical shower daily for ninety (90) days.  (Doc. 150 ¶ 14; Doc. 169 ¶ 16.)  On August 27, 1997, Dr. Shumaker extended the daily 15-minute medical shower order for another six (6) months.  (Doc. 150 ¶ 15; Doc. 169 ¶ 17.) Plaintiff adds that on that same date, however, Dr. Shumaker cancelled that order for medical showers.  (Doc. 175 ¶ 15; Doc. 177 ¶ 17.)  On December 3, 1997, Dr. Mohadjerein extended the daily 15-minute medical shower order for another six (6) months.  (Doc. 150 ¶ 16; Doc. 169 ¶ 18.)  On May 26, 1998, Dr. Reiners extended the medical shower order for another six (6) months.  (Doc. 150 ¶ 17; Doc. 169 ¶ 19.)

PA Stehley ordered a daily 15-minute medical shower in the infirmary for six (6) months on November 2, 1998, and again on May 3, 1999. (Doc. 150 ¶ 18; Doc. 169 ¶ 20.) On September 30, 1999, Defendant PA Mills ordered a daily 15-minute medical shower in the infirmary for six (6) months. (Doc. 150 ¶ 19; Doc. 169 ¶ 22.) On March 21, 2000, Defendant PA Mills extended that order for another six (6) months. (Doc. 150 ¶ 21; Doc. 169 ¶ 24.) On September 13, 2000, Dr. Araneda ordered medical showers in the infirmary for three (3) months. (Doc. 150 ¶ 22; Doc. 169 ¶ 25.) On or around September 14, 2000, Dr. Bardell ordered showers in the infirmary for six (6) months. (Doc. 150 ¶ 23; Doc. 175 ¶ 23; Doc. 169 ¶ 26; Doc. 177 ¶ 26.) However, on September 15, 2000, Dr. Shumaker indicated there was no medical necessity for showers in the infirmary, as it was a housing issue. (Doc. 150 ¶ 24; Doc. 169 ¶ 27.) Thereafter, on December 13, 2000, Dr. Kimber ordered a daily medical shower of fifteen (15) to thirty (30) minutes for one (1) year. (Doc. 150 ¶ 25; Doc. 169 ¶ 28.)

On February 27, 2001, Dr. Reiners discontinued the order for Plaintiff's medical showers. (Doc. 150 ¶ 26; Doc. 169 ¶ 29.) However, in March 2001, Plaintiff was approved for alternate shower arrangements. (Doc. 150 ¶ 27; Doc. 169 ¶ 30.) Almost a year later, on January 23, 2002, Plaintiff was indefinitely ordered to a

bottom bunk/bottom tier cell.  (Doc. 150 ¶ 28; Doc. 169 ¶ 31.)  The next month, Plaintiff requested clearance for aerobics, but was denied.  (Doc. 150 ¶ 29; Doc. 169 ¶ 32.)  Also with respect to aerobics, it is noted that Plaintiff was previously cleared for aerobics but not organized sports dating back to 1996.  (Doc. 150 ¶ 20; Doc. 169 ¶ 23; Doc. 177 ¶ 23.)

Throughout 2002, 2003, and 2004, Plaintiff was seen numerous times by medical providers to review his medications and discuss his RSD condition.  (Doc. 150 ¶ 30; Doc. 169 ¶ 33.)  On August 21, 2004, Defendant PA Auman noted that she told a corrections officer from Plaintiff's cellblock that a head start to the showers is appropriate for Plaintiff to allow him extra time in the shower, but that Plaintiff did not need to stay through both groups of shower times.  (Doc. 150 ¶ 31; Doc. 175 ¶ 31.)  Defendants assert that this directive from Defendant PA Auman was not an order discontinuing longer showers, and Plaintiff counters that PA Auman materially altered Plaintiff's access to the showers.  (Doc. 150 ¶ 32; Doc. 175 ¶ 32.)

On January 6, 2005, Defendant Dr. Beregovskaya renewed the order for 15-minute medical showers as needed for twelve (12) months.[4]  (Doc. 150 ¶ 33; Doc. 169

---

[4]   Both sets of Defendants assert here that, up to this time, Plaintiff had been ordered the medical showers.  (Doc. 150 ¶ 34; Doc. 169 ¶ 35.)  Plaintiff disputes this fact, stating, "Plaintiff's medical records confirm Defendants engaged in a continuous practice of discontinuing Plaintiff's medical showers, requiring Plaintiff to repeatedly request to have medical showers renewed."  (Doc.

¶ 34.)  She then met with Plaintiff on April 3, 2006, and completed Plaintiff's paperwork for the Department of Veterans Affairs.  (Doc. 150 ¶ 35.)

Sometime in mid-2006, Plaintiff ceased his active employment in the institution's CI office.  (Doc. 150 ¶ 36; Doc. 169 ¶ 36.)  On August 18, 2006, Defendant PA Mills ordered medical showers for 180 days.  (Doc. 150 ¶ 37; Doc. 169 ¶ 37.)  Plaintiff adds that, as of August 31, 2006, it appears that the order had not been issued or processed.  (Doc. 175 ¶ 37; Doc. 177 ¶ 37.)  On September 13, 2006, Plaintiff saw Defendant PA Mills and requested to be cleared for aerobics, and was referred to the physician line.  (Doc. 150 ¶ 38; Doc. 169 ¶ 38.)  Further, in a September 14, 2006 progress note, Defendant PA Mills noted that Plaintiff wanted to see a physician to be cleared for activities.  (Doc. 150 ¶ 39; Doc. 169 ¶ 39.)  On September 18, 2006, Defendant Dr. Beregovskaya examined Plaintiff, who was requesting medical showers, a cervical collar, abdominal binder, and an indefinite order for bottom-bunk status.  (Doc. 169 ¶ 40.)  Dr. Beregovskaya noted that Plaintiff was very physically active and therefore did not need the medical showers.  (Doc. 150 ¶ 40; Doc. 169 ¶ 41.)  After the examination, Dr. Beregovskaya cleared Plaintiff for aerobic activity and discontinued the medical showers.  (Doc. 150 ¶ 41; Doc. 169 ¶

───────────────

175 ¶ 34; Doc. 177 ¶ 35.)

42.)  The next day, Defendant PA Auman saw Plaintiff and discontinued the abdominal binder as Plaintiff was not using it and the physician agreed the binder was not medically necessary.  (Doc. 150 ¶ 42; Doc. 169 ¶ 43.)

On September 19, 2006, Dr. Stanley Kotala, a consulting physician, reviewed Plaintiff's veterans records and noted that Plaintiff had RSD of the left upper and lower extremities resulting from multiple motor vehicle accidents in the early 1990s; a post-concussion syndrome with service-connected torticollis; chronic cervical sprain with history of C5-C6 herniated disc noted on an MRI in 2000; and chronic lumbar pain and post-concussion syndrome resulting in short-term memory loss and headaches.  (Doc. 150 ¶ 43; Doc. 169 ¶ 44.)  Dr. Kotala did not adjust Plaintiff's treatment plan.  (Doc. 150 ¶ 44; Doc. 169 ¶ 45.)

On October 3, 2006, Defendant PA Auman noted that Plaintiff had signed up for sick call asking for medical showers to be reinstated and that she witnessed Dr. Araneda tell Plaintiff that the orders came from Dr. Beregovskaya, the medical director.  (Doc. 150 ¶ 46; Doc. 169 ¶ 46.)  Plaintiff adds that he was then charged for an "unnecessary" request.  (Doc. 175 ¶ 46; Doc. 177 ¶ 46.)

During his deposition, Plaintiff stated that the season determined how quickly his symptoms worsened after his medical showers were discontinued.  (Doc. 175 ¶

9

47; Doc. 177 ¶ 47.)  Plaintiff assumed that in autumn it would take a couple weeks of foregoing medical showers for his symptoms to worsen.  (Doc. 150 ¶ 47; Doc. 169 ¶ 47; Doc. 175 ¶ 47; Doc. 177 ¶ 47.)  Related to these facts, on October 6, 2006, Defendant PA Auman and Dr. Araneda noted Plaintiff's complaints of regression and exacerbation of his RSD since discontinuing his medical showers, but Dr. Araneda believed there was a psychological component to his complaints.  (Doc. 150 ¶ 48; Doc. 175 ¶ 48; Doc. 169 ¶ 48; Doc. 177 ¶ 48.)

On October 12, 2006, Defendant PA Mills examined Plaintiff and advised him to use hot compresses to address his complaints during the period that his medical showers were discontinued.  (Doc. 150 ¶ 51; Doc. 169 ¶ 49.)  PA Mills advised Plaintiff that he would be charged for unnecessary future visits regarding his medical showers, and charged him for the visit that day.  (Doc. 150 ¶ 50; Doc. 175 ¶¶ 50, 51.)

On November 4, 2006, nursing staff noted a concern that Plaintiff was malingering/manipulating care.  (Doc. 150 ¶ 52; Doc. 169 ¶ 50.)  On November 6, 2006, Dr. Salomon ordered medical showers for 180 days.  (Doc. 150 ¶ 53; Doc. 169 ¶ 51.)

On February 26, 2007, Plaintiff received a cane.  (Doc. 150 ¶ 54; Doc. 169 ¶ 52.)  On March 19, 2007, Dr. Klemick ordered daily 15-minute medical showers for

twelve (12) months.  (Doc. 150 ¶ 55; Doc. 169 ¶ 53.)  However, Dr. Klemick discontinued the medical showers on March 21, 2007, and ordered Plaintiff to be seen on or around March 26, 2007.  (Doc. 150 ¶ 56; Doc. 169 ¶ 54.)  On March 26, 2007, Dr. Klemick reinstated the order for daily medical showers of ten (10) to twelve (12) minutes for 180 days.  (Doc. 150 ¶ 57; Doc. 169 ¶ 55.)

On April 17, 2007, Defendant PA Auman noted that Plaintiff was to be re-evaluated for possible discontinuance of his bottom bunk status and use of a cane. (Doc. 150 ¶ 58; Doc. 169 ¶ 56.)  The re-evaluation was requested by Dr. Klemick, after three to four weeks of aerobics to re-strengthen Plaintiff's extremities.  (Doc. 175 ¶ 58; Doc. 177 ¶ 56.)  PA Auman noted that she had watched Plaintiff "hustle" to the yard carrying his cane and discussed this observation with Dr. Klemick.  (Doc. 150 ¶ 59; Doc. 169 ¶ 57.)  The parties dispute that this observation led to Dr. Klemick scheduling the re-evaluation in four weeks.  (Doc. 150 ¶ 59; Doc. 169 ¶ 57; Doc. 175 ¶ 59; Doc. 177 ¶ 57.)

On May 17, 2007, PA Auman examined Plaintiff and, in consultation with Dr. Klemick, modified Plaintiff's housing status so that he was now required to walk up stairs.  (Doc. 150 ¶ 60; Doc. 169 ¶ 58.)  Defendants assert that the walking would be beneficial to Plaintiff.  (Doc. 150 ¶ 60; Doc. 169 ¶ 58.)  Further, PA Auman noted

11

that Plaintiff was able to do aerobics three times a week and that the cane would be discontinued because it was a safety hazard climbing stairs with a hand rail.  (Doc. 150 ¶ 61; Doc. 169 ¶ 59.)  In addition, PA Auman ordered Plaintiff to bottom bunk status and discontinued Plaintiff's cane.  (Doc. 150 ¶ 61; Doc. 169 ¶ 59.)

On July 16, 2007, Dr. Klemick requested assistance from the Department of Veterans Affairs by completing a Statement in Support of Claim, which is required to be completed by the physician of the veteran applying for benefits.  (Doc. 150 ¶ 62; Doc. 175 ¶ 62.)  Further, on July 30, 2007, Dr. Klemick ordered a cane, ground level housing and medical showers for Plaintiff through October 31, 2007.  (Doc. 150 ¶ 63; Doc. 169 ¶ 60.)  The next day, Dr. Klemick requested a consultation with Dr. Patitsas to follow up visit on an earlier visit on June 22, 2007 with neurosurgery for assistance with RSD management.  (Doc. 150 ¶ 64; Doc. 169 ¶ 61.)

On October 11, 2007, PA Auman requested a consultation with Dr. Patitsas for a follow up visit from the previous visit on September 14, 2007.  (Doc. 150 ¶ 65; Doc. 169 ¶ 62.)  Instead, Dr. Long ordered an assessment by the medical director. (Doc. 150 ¶ 66; Doc. 169 ¶ 63.)

On October 18, 2007, Dr. Jeffrey Esper examined Plaintiff via telemedicine for a neurological consultation of RSD.  (Doc. 150 ¶ 67; Doc. 169 ¶ 64.)  Plaintiff

reported his symptoms were under control and tolerable with a combination of

Tylenol, aspirin, and medical showers used for therapy.  (Doc. 150 ¶ 68; Doc. 169 ¶

65.)  Plaintiff also stated that, in the autumn of 2006, he was off all treatments and his

symptoms had been worsening ever since.  (Doc. 150 ¶ 69; Doc. 169 ¶ 66; Doc. 175 ¶

69; Doc. 177 ¶ 66.)  After his examination in October 2007, Dr. Esper recommended

symptomatic therapies and consistent continuation of a combination of Tylenol and

aspirin with the medical showers.  (Doc. 150 ¶ 70; Doc. 169 ¶ 67.)  He specifically

noted that medical showers are therapeutic fo RSD.  (Doc. 175 ¶ 70; Doc. 177 ¶ 67.)

Due to the chronic condition, Dr. Esper did not recommend narcotics and indicated

that medications for nerve pain could be tried if Tylenol and aspirin were ineffective

to alleviate the pain.  (Doc. 150 ¶ 71; Doc. 169 ¶ 68.)

On October 19, 2007, Dr. Klemick ordered a cane, ground level housing, and

ten (10) to twelve (12) minute medical showers through February 28, 2008.  (Doc.

150 ¶ 72; Doc. 169 ¶ 69.)  On November 27, 2007, Dr. Klemick noted that Plaintiff

was "doing a lot better," using his cane intermittently, and that his pain was

manageable for the time being.  (Doc. 150 ¶ 73; Doc. 169 ¶ 70; Doc. 175 ¶ 73; Doc.

177 ¶ 70.)

On December 11, 2007, PA Brown noted that Plaintiff wanted permission to do aerobics and light weight exercises. (Doc. 150 ¶ 74; Doc. 169 ¶ 71.)  She also noted that Plaintiff walked without difficulty. (Doc. 150 ¶ 74; Doc. 169 ¶ 71.)  She discussed the case with Dr. Klemick who, because he was familiar with Plaintiff as a patient, clarified Plaintiff's restrictions.  (Doc. 150 ¶ 74; Doc. 169 ¶ 71.)  Dr. Klemick examined Plaintiff on December 18, 2007 and noted that Plaintiff had a satisfactory gait with slight use of the cane.  (Doc. 150 ¶ 75; Doc. 169 ¶ 72; Doc. 175 ¶ 75; Doc. 177 ¶ 72.)  He planned to review Plaintiff's activity program with the institution's activity manager.  (Doc. 150 ¶ 75; Doc. 169 ¶ 72.)

On January 25, 2008, PA Mills and Dr. Araneda ordered ground level housing and ten (10) to twelve (12) minutes of medical showers as needed, as well as a cane for one (1) year.  (Doc. 150 ¶ 76; Doc. 169 ¶ 73.)  This was PA Mills' last documented interaction with Plaintiff.  (Doc. 169 ¶ 74; Doc. 175 ¶ 75.)

On February 6, 2008, PA Auman noted that Plaintiff wanted to renew his restrictions, but also that Plaintiff had been seen carrying his cane rather than using it. (Doc. 150 ¶ 77; 169 ¶ 75.)  Although Defendants assert that this was PA Auman's last documented interaction with Plaintiff, (Doc. 150 ¶ 77 n.5; Doc. 169 ¶ 76), Plaintiff

14

counters that Plaintiff's progress notes indicate that June 20, 2008 was PA Auman's last documented interaction with Plaintiff, (Doc. 175 ¶ 77; Doc. 177 ¶ 76).

On February 19, 2008, Dr. Klemick ordered ten (10) to twelve (12) minute medical showers, as well as lower bunk status and a cane, through August 31, 2008. (Doc. 150 ¶ 78; Doc. 169 ¶ 77.)  He noted that he was trying to wean Plaintiff from his cane.  (Doc. 150 ¶ 79; Doc. 169 ¶ 78.)  Further, in a April 14, 2008 note, Dr. Klemick noted that Plaintiff had a medical shower order effective through August 31, 2008.  (Doc. 150 ¶ 82; Doc. 169 ¶ 81.)  On August 29, 2008, PA Poland and Dr. Araneda ordered medical showers for one year.  (Doc. 150 ¶ 84; Doc. 169 ¶ 83.)

On March 24, 2008, Plaintiff wore a holter monitor, which showed a normal sinus rhythm but episodes of P-wave changes and ST wave inversions.  (Doc. 150 ¶ 80; Doc. 169 ¶ 79.)  Thereafter, Plaintiff was examine by a cardiac specialist.  (Doc. 150 ¶ 82; Doc. 169 ¶ 81.)  On May 29, 2008, Plaintiff's chest x-ray was normal with mild degenerative changes of the mid- and upper-thoracic spine.  (Doc. 150 ¶ 83; Doc. 169 ¶ 82.)  A catheterization in December 2008 showed angiographically normal coronary arteries and normal LV function.  (Doc. 150 ¶ 85; Doc. 169 ¶ 84.)  Further, a January 5, 2009 cardiology consult with Blair Medical Associates indicated that Plaintiff's heart function looked normal and the stress test was a false positive.

15

(Doc. 150 ¶ 86; Doc. 169 ¶ 85.)  On February 6, 2009, Plaintiff wore a holter monitor due to an indication of arrhythmia as ordered by Dr. Shoaf.  (Doc. 150 ¶ 87; Doc. 169 ¶ 86.)  The holter revealed some bradycardia, but it was fairly unremarkable.  (Doc. 150 ¶ 87; Doc. 169 ¶ 86.)

On July 20, 2009, PA Riscigno ordered bottom bunk and tier status and medical showers, as well as a cane as needed.  (Doc. 150 ¶ 88; Doc. 169 ¶ 87.) Further, on December 10, 2009, PA Riscigno ordered bottom bunk and tier status with extended medical showers and a cane as needed for 180 days.  (Doc. 150 ¶ 89; Doc. 169 ¶ 88.)  However, Dr. Shoaf rescinded the medical showers for Plaintiff on January 5, 2010.  (Doc. 150 ¶ 90; Doc. 169 ¶ 89.)  On January 27, 2010, PA Riscigno ordered bottom bunk and tier status with extended medical showers and a cane for 180 days.  (Doc. 150 ¶ 91; Doc. 169 ¶ 90.)  On February 10, 2010, Dr. Sarah Whitman, who never personally examined Plaintiff, sent a letter at the request of Jim Broatch indicating that extended medical showers could be used to treat Plaintiff. (Doc. 150 ¶ 92; Doc. 169 ¶ 91.)  On February 12, 2010, Dr. Shoaf ordered regular length showers only.  (Doc. 150 ¶ 93; Doc. 169 ¶ 92.)  On February 26, 2010, x-rays of Plaintiff's left tibia and fibula revealed no fracture or significant deformity, and an x-ray of his left hip showed no change from a prior study in 2007.  (Doc. 150 ¶ 94.)

On April 15, 2010, nursing staff noted that Plaintiff was observed walking up four flights of stairs keeping up with other inmates without difficulty and without using his cane.  (Doc. 150 ¶ 95; Doc. 169 ¶ 93.)  On May 27, 2010, PA Riscigno ordered bottom bunk and tier status with extended medical showers and a cane for 180 days.  (Doc. 150 ¶ 96; Doc. 169 ¶ 94.)  However, on the same date, Dr. Shoaf discontinued the medical showers.  (Doc. 150 ¶ 97; Doc. 169 ¶ 95.)

On June 18, 2010, PA Poland noted that Plaintiff requested reinstatement of his medical showers order and that he was walking without a cane.  (Doc. 150 ¶ 98; Doc. 169 ¶ 96.)  Thereafter, on June 23, 2010, Dr. Shoaf cancelled Plaintiff's appointment to discuss renewal of Plaintiff's medical showers order and instated an order providing for standard showers only.  (Doc. 150 ¶ 99; Doc. 169 ¶ 97; Doc. 175 ¶ 99; Doc. 177 ¶ 97.)  Dr. Shoaf noted that Plaintiff already had eight (8) to thirteen (13) minute medical showers, and felt that Plaintiff was being manipulative.  (Doc. 150 ¶ 99; Doc. 169 ¶ 97; Doc. 175 ¶ 99; Doc. 177 ¶ 97.)  Dr. Shoaf found no reason to extend the regular shower length and denied further appointments to discuss medical showers.  (Doc. 150 ¶ 99; Doc. 169 ¶ 97; Doc. 175 ¶ 99; Doc. 177 ¶ 97.)

On December 12, 2010, Plaintiff was seen in the J.C. Blair Memorial Hospital Emergency Room after he fell when his left side apparently gave out.  (Doc. 150 ¶

17

100; Doc. 169 ¶ 98.)  Plaintiff was using his cane at the time of the fall.  (Doc. 150 ¶ 101; Doc. 169 ¶ 99.)  CT scans of Plaintiff's head and cervical spine were negative for any fracture.  (Doc. 150 ¶ 102; Doc. 169 ¶ 100.)

On January 12, 2011, PA Riscigno ordered extended medical showers of thirteen (13) to twenty (20) minutes, as well as bottom bunk and tier status.  (Doc. 150 ¶ 103; Doc. 169 ¶ 101.)  Thereafter, the Regional Medical Director met with Plaintiff on February 17, 2011, and limited the medical showers to one (1) per day for fifteen (15) to twenty (20) minutes.  (Doc. 150 ¶ 104; Doc. 169 ¶ 102.)

On May 20, 2011, PA Trimai ordered extended medical showers of thirteen (13) to twenty (20) minutes, as well as bottom bunk and tier status.  (Doc. 150 ¶ 105; Doc. 169 ¶ 103.)  Around that time, Dr. Araneda referred Plaintiff for a neurology consult on September 21, 2011.  (Doc. 150 ¶ 106; Doc. 169 ¶ 104.)

Later that year, nursing staff noted that Plaintiff walked into the medical department on September 8, 2011, with no limp or discomfort, and with improper use of his cane.  (Doc. 150 ¶ 107; Doc. 169 ¶ 105.)  Further, Dr. Araneda discontinued Plaintiff's cane on September 8, 2011, after learning that Plaintiff had been observed running on the institution's track.  (Doc. 150 ¶ 108; Doc. 169 ¶ 106.)  Plaintiff requested his cane back the next day, but was told by PA Trimai that he had been

seen running on the track to the point of passing other runners and that the cane was therefore not necessary at the time.  (Doc. 150 ¶ 109; Doc. 169 ¶ 107.)  However, PA Trimai renewed Plaintiff's bottom bunk and tier status, as well as the thirteen (13) to twenty (20) minute medical showers for 180 days on October 24, 2011.  (Doc. 150 ¶ 110; Doc. 169 ¶ 108.)  Plaintiff adds that a request for this same relief by Plaintiff was denied three (3) days prior by another staff member.  (Doc. 175 ¶ 110; Doc. 177 ¶ 108.)

In addition to the above-described medical care, Plaintiff has been prescribed with the following medications for his pain over the past several years: Tylenol, Cymbalta, Elavil, Naprosyn, and Ultram.  (Doc. 150 ¶ 111; Doc. 169 ¶ 109.)

### B.    Facts Relating to Grievance History

The administrative remedies for inmate grievances are provided for in DOC Administrative Directive 804 ("DC-AMD 804"), which provides a three-tiered grievance review system.  (Doc. 169 ¶ 110.)  Within the time period from 1996 through December 2010, Plaintiff filed several grievances regarding his complaints for accommodations associated with his medical condition, including orders for medical showers.  (Doc. 169 ¶ 111; Doc. 175 ¶ 111.)  The court will set forth

Plaintiff's grievances, beginning with his most recent at the time of the filing of the instant motions by Defendants.

On March 3, 2011, Plaintiff submitted Grievance No. 356548, claiming that his health had deteriorated because he had not previously been approved for medical showers.  (Doc. 150 ¶ 113; Doc. 169 ¶ 112; Doc. 175 ¶ 115; Doc. 177 ¶ 113.)  While Medical Defendants assert that this grievance did not identify any of them, (Doc. 150 ¶ 114), Plaintiff counters that the grievance put these Defendants on notice because it named Prison Health Services ("PHS"), a former defendant in this action and the employer of these Medical Defendants.  (Doc. 175 ¶ 114.)  Further, both sets of Defendants assert that this grievance was untimely filed and therefore rejected by the DOC's Secretary's Office of Inmate Grievances and Appeals ("SOIGA") in May 2011.  (Doc. 150 ¶ 115; Doc. 169 ¶ 113.)  Plaintiff counters that this March 3, 2011 grievance was based upon facts Plaintiff obtained after he and the prison's Medical Director reviewed his medical file on February 17, 2011.  (Doc. 175 ¶ 115; Doc. 177 ¶ 113.)  Because the DOC's Administrative Directive 804 ("ADM-804") states that inmates must submit a grievance within fifteen (15) working days after the event upon which the claim is based, Plaintiff asserts that this grievance, submitted eleven

(11) working days after the February 17, 2011 consultation with the Medical Director, was improperly rejected as untimely.  (Doc. 175 ¶ 115; Doc. 177 ¶ 113.)

In December 2010, Plaintiff submitted Grievance No. 348702 relating to his medical showers.  (Doc. 150 ¶ 116; Doc. 169 ¶ 114.)  SOIGA rejected this grievance in February 2011 as frivolous and duplicative of prior grievances.  (Doc. 150 ¶ 116; Doc. 169 ¶ 114.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 117), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 117).

In either October or November 2010, Plaintiff submitted Grievance No. 341241 raising the issue of his medical showers.  (Doc. 150 ¶ 118; Doc. 169 ¶ 115.)  This grievance was rejected by SOIGA as untimely in February 2011.  (Doc. 150 ¶ 118; Doc. 169 ¶ 115.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 119), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 119).

In November 2010, Plaintiff submitted Grievance No. 343468 raising the issue of his medical showers.  (Doc. 150 ¶ 123; Doc. 169 ¶ 118.)  The grievance was rejected in December 2010 as duplicative of prior Grievance Nos. 310913, 324608, and 330853.  (Doc. 150 ¶ 123; Doc. 169 ¶ 118.)

In August 2010, Plaintiff submitted Grievance No. 330853 raising the issue of his medical showers.  (Doc. 150 ¶ 120; Doc. 169 ¶ 116.)  This grievance mentions previous treatment by Defendants Beregovskaya, Auman, and Mills.  (Doc. 150 ¶ 121.)  On February 26, 2011, SOIGA dismissed the grievance at the final appeal level because Plaintiff did not provide the required documentation.  (Doc. 150 ¶ 121; Doc. 169 ¶ 117.)

In July 2010, Plaintiff submitted Grievance No. 324608 challenging his medical care, including the discontinuance of his medical showers.  (Doc. 150 ¶ 124; Doc. 169 ¶ 119; Doc. 175 ¶ 124; Doc. 177 ¶ 119.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 125), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 125).  The Bureau of Health Care Services ("BHCS") reviewed the grievance in October 2010 and found that the medical care provided was reasonable and appropriate, and that there was a prescribed medication regime to follow and treatment modalities would be ordered as medically necessary.  (Doc. 150 ¶ 126; Doc. 169 ¶ 120.)

In May 2010, Plaintiff submitted Grievance No. 319857 challenging both the adequacy of his medical shower order and Dr. Shoaf's failure to examine him on May 19, 2010, despite Plaintiff being scheduled for an appointment.  (Doc. 150 ¶ 127;

Doc. 169 ¶ 121.)  Plaintiff adds that Dr. Shoaf viewed this appointment as "redundant" and instructed that it be cancelled.  (Doc. 175 ¶ 127; Doc. 177 ¶ 121.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 128), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 128).  The grievance was rejected by SOIGA as untimely on July 7, 2010.  (Doc. 150 ¶ 129; Doc. 169 ¶ 122.)  Plaintiff asserts, however, that because the grievance was submitted on May 26, 2010, a date within fifteen (15) working days of the May 19, 2010 incident, the denied based on untimely submission was improper.  (Doc. 175 ¶ 129; Doc. 177 ¶ 122.)

In March 2010, Plaintiff submitted Grievance No. 310193 requesting longer medical showers, along with specific orders for the staff in his housing unit and in the shower area.  (Doc. 150 ¶ 130; Doc. 169 ¶ 123; Doc. 175 ¶ 130; Doc. 177 ¶ 123.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 131), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 131).  The Superintendent responded to this grievance in April 2010, noting that Plaintiff was permitted the maximum time possible for his shower, which ranged from thirteen (13) to twenty (20) minutes.  (Doc. 150 ¶ 132; Doc. 169 ¶ 124.)  Plaintiff adds that by physician's order of January 27, 2010, Plaintiff was

granted longer medical showers for 180 days, but on February 27, 2010, Dr. Shoaf ordered regular length showers only.  (Doc. 175 ¶ 132; Doc. 177 ¶ 124.)  Further, on appeal to final review, the BHCS reviewed Plaintiff's care and found that he was receiving medical showers, and therefore denied Plaintiff's grievance.  (Doc. 150 ¶ 133; Doc. 169 ¶ 125.)  Defendants assert that the BHCS found there was no evidence in the literature submitted that showed extended showers were of any benefit.  (Doc. 150 ¶ 133; Doc. 169 ¶ 125.)  Plaintiff denied this assertion.  (Doc. 175 ¶ 133; Doc. 177 ¶ 125.)

In February 2010, Plaintiff submitted Grievance No. 308189 raising the issue of his medical showers and claiming retaliation.  (Doc. 150 ¶ 134; Doc. 169 ¶ 126.) The grievance was denied in February 2010 as duplicative of Grievance No. 306489. (Doc. 150 ¶ 135; Doc. 169 ¶ 127.)  Further, Defendant Dr. Beregovskaya is identified in this grievance, but only with respect to a recommendation she made for medical showers in 2005.  (Doc. 150 ¶ 136; Doc. 161-2 at 2.)  This grievance was not appealed to final review.  (Doc. 150 ¶ 137; Doc. 169 ¶ 128.)

Also in February 2010, Plaintiff submitted Grievance No. 306489 to request longer medical showers and an appointment with Dr. Shoaf.  (Doc. 150 ¶ 138; Doc. 169 ¶ 129.)  Medical Defendants assert that they were not identified in this grievance,

24

(Doc. 150 ¶ 139), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 139).  In a February 26, 2010 response to the grievance, the Superintendent noted:

> As Ms. Showalter explained in her response to your initial grievance, you must discuss this request with the practitioner.  The practitioner is the only one with the authority to amend the order for medical showers. If you want to discuss this issue with a doctor, it is your responsibility to sign up for sick call screening.  Before your visit with the PA begins, you must inform the PA that you wish to see the doctor and not the PA.  You will be referred to the next available appointment; however, you cannot choose which doctor you wish to see.  Ms. Showalter has provided an appropriate response to your grievance, and it is up to you to follow up if you wish.

(Doc. 162-1 at 4, Ex. 32.)  On final review by SOIGA, the grievance was denied and found to be frivolous on March 29, 2010.  (Doc. 150 ¶ 140; Doc. 169 ¶ 130.)

In November 2007, Plaintiff submitted Grievance No. 206309 raising the issues of his medical showers and 2006 co-pays for medical care.  (Doc. 150 ¶ 141; Doc. 169 ¶ 131.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 142), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 142).  On January 16, 2008, SOIGA denied Plaintiff's appeal on final review, noting that the BHCS found that the co-pay issue was not timely and that the medical department has discretion to approve special orders such as medical showers and bottom bunk and tier status, per DOC policy.  (Doc. 150 ¶

25

143; Doc. 169 ¶ 132.)  The BHCS also found no evidence of neglect or deliberate indifference by medical staff.  (Doc. 150 ¶ 143; Doc. 169 ¶ 132.)

In July 2007, Plaintiff submitted Grievance No. 189725 taking issue with Defendant PA Auman's order of May 18, 2007 that rescinded Plaintiff's bottom bunk and tier status.  (Doc. 150 ¶ 144; Doc. 169 ¶ 133.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 145), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 145).  On October 30, 2007, SOIGA denied Plaintiff's appeal on final review, noting that the BHCS had determined that there was no permanent order for bunking status and that Plaintiff was assigned to bottom bunk and tier status for a six (6) month period with a re-evaluation every six (6) months.  (Doc. 150 ¶ 146; Doc. 169 ¶ 134.)  The BHCS also found no evidence of neglect or deliberate indifference by medical staff.  (Doc. 150 ¶ 146; Doc. 169 ¶ 134.)

In April 2007, Plaintiff submitted Grievance No. 185417 claiming that the medical department was not making reasonable accommodations for his medical needs and emphasizing medical showers, an electric razor, a mattress and pillow, and single cell bottom bunk clearance.  (Doc. 150 ¶ 149; Doc. 169 ¶ 137.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 150),

26

but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 150).  On April 24, 2007, the Facility Grievance Coordinator rejected the grievance as duplicative of a prior grievance filed in February 2007.  (Doc. 150 ¶ 151; Doc. 169 ¶ 139.)  Plaintiff did not appeal this decision.  (Doc. 150 ¶ 152; Doc. 169 ¶ 140.)

On March 19, 2007,[5] Plaintiff submitted Grievance No. 180386 raising the issue of his medical showers and seeking the use of a cane.  (Doc. 150 ¶ 147; Doc. 169 ¶ 135; *see also* Doc. 163-1 at 8.)  SOIGA dismissed this grievance on the final appeal level because Plaintiff had failed to appeal to the Facility Manager even after being reminded to do so.  (Doc. 150 ¶ 148; Doc. 169 ¶ 136.)

In February 2007, Plaintiff submitted Grievance No. 178653 challenging his medical co-pays.  (Doc. 150 ¶ 160; Doc. 169 ¶ 148.)  Medical Defendants assert that they were not identified in this grievance, (Doc. 150 ¶ 162), but Plaintiff counters that the grievance put them on notice because it named PHS, (Doc. 175 ¶ 162).  This

---

[5]  It appears that Plaintiff's initial grievance was rejected because the Facility Grievance Coordinator was unsure the basis of Plaintiff's grievance, (Doc. 163-1 at 7), but Plaintiff responded with a clarification on March 19, 2007, which appears to have been accepted by the Grievance Coordinator, (*id*. at 8).  Thus, the court will construe the filing date of this grievance as March 19, 2007.

grievance was dismissed by SOIGA in March 2007 due to Plaintiff's failure to submit proper documentation.  (Doc. 150 ¶ 161; Doc. 169 ¶ 149.)

On October 31, 2006, Plaintiff submitted Grievance No. 168334 challenging the discontinuance of his medical showers and requesting that they be reinstated. (Doc. 150 ¶ 156; Doc. 169 ¶ 144; Doc. 175 ¶ 156; Doc. 177 ¶ 144.)  In a November 2006 resolution of the grievance, the Grievance Officer noted that Dr. Salomon had discontinued the medical showers for two (2) weeks and then rechecked Plaintiff. (Doc. 150 ¶ 157; Doc. 169 ¶ 145.)  In addition, it was noted that Plaintiff's showers were reinstated on a temporary basis pending receipt and review of his VA Hospital records.  (Doc. 150 ¶ 158; Doc. 169 ¶ 146.)  Plaintiff adds, however, that his medical showers were not reinstated until November 6, 2006.  (Doc. 177 ¶ 146.)  Defendant PA Auman is identified in this grievance, which was not appealed to final review. (Doc. 150 ¶ 159; Doc. 169 ¶ 147.)

On October 6, 2006, Plaintiff submitted Grievance No. 166084 claiming a worsening of his medical condition that was not being properly treated, and requesting reinstatement of his medical showers.  (Doc. 150 ¶ 153; Doc. 169 ¶ 141; Doc. 175 ¶ 153; Doc. 177 ¶ 141.)  On October 17, 2006, the Grievance Coordinator responded, noting that Plaintiff's VA Hospital records had been requested and would

28

be reviewed upon receipt so that his treatment plan could be changed, if necessary. (Doc. 150 ¶ 154; Doc. 169 ¶ 142.)  Plaintiff did not appeal this decision.  (Doc. 150 ¶ 155; Doc. 169 ¶ 143.)

Medical Defendants conclude by asserting that, of the grievances that identified any of the Medical Defendants, only Grievance No. 189725 involving Defendant PA Auman's visit of May 18, 2007 was exhausted through final review.  (Doc. 150 ¶ 163.)  Plaintiff denies this assertion.  (Doc. 175 ¶ 163.)  Medical Defendants also assert that the May 18, 2007 visit did not relate to Plaintiff's medical showers.  (Doc. 150 ¶ 164.)

C.    **Procedural History**

Plaintiff initiated this civil action *pro se* with a complaint filed on January 11, 2010, pursuant to the provisions of 42 U.S.C. § 1983.[6]  (Doc. 1.)  On June 10, 2010, Plaintiff filed a motion for leave to file an amended complaint.  (Doc. 39.)  After responsive and reply briefing was submitted, (*see* Docs. 47 & 50), Plaintiff amended his complaint with leave of court, (Doc. 69).  Thereafter, both sets of Defendants moved for dismissal.  (*See* Docs. 71 & 81.)  By order dated October 12, 2011, the court granted in part and denied in part Defendants' motions to dismiss.  (Doc. 106.)

---

[6]  Plaintiff has been represented by counsel since March 31, 2011.  (*See* Docs. 86 &87.)

29

Specifically, the court dismissed parties "John/Jane Doe, Unknown Employees of

Pennsylvania Department of Corrections," the DOC and PHS, as well as claims under

the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §

12131, *et seq*.  (*Id*.)  Material to the instant dispositive motions, the court also decided

the following:  (1) Plaintiff's § 1983 claims for money damages against the remaining

Corrections Defendants in their individual capacities, as well as his claims for

injunctive relief, remained viable; (2) both motions to dismiss relating to Plaintiff's

conspiracy claim against all Defendants were denied; (3) Medical Defendants' motion

to dismiss arguing that the continuing violations doctrine is not applicable to

Plaintiff's claims was denied; (4) Medical Defendants' motion to dismiss Plaintiff's

claims for failure to exhaust his administrative remedies was denied; (5) Medical

Defendants' motion to dismiss arguing that Plaintiff failed to state a claim of

deliberate indifference to his medical needs was denied; and (6) Plaintiff's procedural

due process claim under the Fourteenth Amendment against Corrections Defendants

Albright and Randolph relating to the November 4, 2006 incident would proceed, and

no Medical Defendant was implicated in such a claim.  (*See id*.)  The court also

directed the Defendants to answer the amended complaint.  (*Id*.)  After the Medical

Defendants answered the amended complaint, (Doc. 107), and the Corrections

Defendants filed a waiver of reply, (Doc. 108), the court issued an order setting forth case management deadlines for the remainder of the proceedings, (Doc. 111).  After several extensions of time, (*see* Docs. 115, 132, 135, 138, 145), motions for summary judgment were filed by both sets of Defendants, (Docs. 148, 167).  Responsive and reply briefing has been filed, and thus, the motions for summary judgment are now ripe for disposition.

## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for granting a motion for summary judgment.  Rule 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id*.  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences

in favor of the same. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the

court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v.*

*Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.   <u>Discussion</u>

A plaintiff, in order to state a viable § 1983 claim, must plead two essential

elements: 1) that the conduct complained of was committed by a person acting under

color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege,

or immunity secured by the Constitution and laws of the United States. *West v.*

*Atkins*, 487 U.S. 42, 48 (1988).  Liability under § 1983 is personal in nature and a

defendant is liable only if he was personally, affirmatively involved in the alleged

wrongdoing.  *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997),

*abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53 (2006) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.

1988)).  A defendant who supervised the wrongdoer but did not personally participate

in the wrongful act is not liable under § 1983 on a theory of *respondeat superior*

unless he personally directed or had actual knowledge of and acquiesced in the

deprivation.  *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (citing *Monell v. New*

*York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *Robinson*, 120 F.3d at

1294.  A defendant who lacked any supervisory power over the wrongdoer and who

was not personally or affirmatively involved in the alleged wrongful conduct is not liable under § 1983. *Id*.

As stated above, there are two motions for summary judgment pending in the instant case. Both sets of Defendants argue that summary judgment should be granted in their favor on the following grounds: (1) Plaintiff's claims are barred by the applicable statute of limitations; (2) Plaintiff's claims should be dismissed because he failed to exhaust his administrative remedies; and (3) Plaintiff has not established that certain Defendants were deliberately indifferent to his serious medical needs. Given this overlap of issues and arguments raised by both sets of Defendants in their respective motions for summary judgment, the court will address the motions together.

## A.     Statute of Limitations

For claims brought pursuant to § 1983, federal courts must apply the statute of limitations for analogous state actions. *Urrutia v. Harrisburg Cnty. Police Dep't*, 91 F.3d 451, 457 n.9 (3d Cir. 1996). Section 1983 claims are analogous to personal injury tort actions and are subject to the state statute of limitations governing such claims. *287 Corporate Ctr. Assocs. v. Twp. of Bridgewater*, 101 F.3d 320, 323 (3d

Cir. 1996).  The governing law here is Pennsylvania's two-year statute of limitations. 42 Pa. Cons. Stat. Ann. § 5524.

The statute of limitations requires that a complaint be filed within its time limits from the time a cause of action accrues.  *See Sprint Commc'ns Co., L.P. v. F.C.C.*, 76 F.3d 1221, 1226 (D.C. Cir. 1996).  The date of accrual for claims brought under Section 1983 is governed by federal law.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Montgomery v. DeSimone*, 159 F.3d 120, 126 (3d Cir. 1998).  Under federal law, "'the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action.'" *Montgomery*, 159 F.3d at 126 (quoting *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 909 (3d Cir. 1991)); *see also Wallace*, 549 U.S. at 388 ("[I]t is the standard rule that [accrual occurs] when the plaintiff has a complete cause of action . . . that is, when the plaintiff can file suit and obtain relief." (internal quotations and citations omitted)).

Here, it is undisputed that medical staff at SCI-Huntingdon ordered medical showers for Plaintiff as early as July 3, 1996.  (Doc. 150 ¶ 14; Doc. 175 ¶ 14; Doc. 169 ¶ 16; Doc. 177 ¶ 16.)  Although the parties seemingly dispute whether Plaintiff needed continuous care for his RSD in the form of medical showers without

35

modifications to Plaintiff's treatment made based on symptoms presented during periodic follow-up examinations, the record provides that Plaintiff filed grievances complaining that his RSD was not being properly treated with medical showers on October 6, 2006 (Grievance No. 166084), and October 31, 2006 (Grievance No. 168334).[7]  (*See* Doc. 150 ¶¶ 153, 156; Doc. 169 ¶¶ 141, 144; Doc. 175 ¶¶ 153, 156; Doc. 177 ¶¶ 141, 144.)  In Grievance No. 166084, citing *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990), Plaintiff specifically described his denial of treatment as an "ongoing 8th Constitutional Amendment, 'cruel and unusual punishment' violation and/with a 'deliberate indifference' to exist where prison officials persist[ ] in a particular course of treatment 'in the face of resultant pain and risk of permanent injury.'"  (Doc. 163-3 at 3.)  Further, Plaintiff was grieving the need for a cane as early as March 19, 2007, in Grievance No. 180386.  (*See* Doc. 163-1 at 8.)  Thus, at the latest, Plaintiff was aware of his injury and had a complete cause of action involving both the medical showers and cane as of March 19, 2007.  Plaintiff, therefore, was required to file a complaint raising those claims by March 19, 2009.  Because Plaintiff did not file his original complaint until January 11, 2010, any claim that arose prior to January 11, 2008, is barred by the two-year statute of limitations.

---

[7]  In their statements of material facts, both sets of Defendants begin their recitation of Plaintiff's grievance history with those grievances filed in 2006 and not earlier.

In so concluding, the court is rejecting Plaintiff's argument that all of his claims are timely due to the continuing violations doctrine. The continuing violations doctrine is an equitable exception to the running of the statute of limitations. It applies "when a defendant's conduct is part of a continuing practice," *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *Brenner v. Local 514, United Bd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)), and the conduct is "more than the occurrence of isolated or sporadic acts," *Cowell*, 263 F.3d at 292 (quoting *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)). Under the doctrine, a plaintiff may bring suit for otherwise time-barred acts "so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell*, 263 F.3d at 292 (quoting *Brenner*, 927 F.2d at 1295). A court should consider three factors in determining the applicability of the continuing violations doctrine: (1) whether the subject matter involves similar conduct; (2) whether the conduct is recurring or isolated; and (3) whether the conduct is of an unchanging nature as to trigger an awareness of and duty to assert rights. *Cowell*, 263 F.2d at 292 (quoting *West*, 45 F.3d at 755 n.9). The third factor requires the court to consider the policy rationale behind the statute of limitations and that "the continuing violations doctrine should not provide a means for relieving the plaintiffs from their duty to

37

exercise reasonable diligence in pursuing their claims." *Cowell*, 263 F.2d at 292.

Indeed, the continuing violations doctrine does not apply to discrete acts of

discrimination or other unconstitutional behavior.  Rather, the doctrine applies only

when the alleged unconstitutional acts are not individually actionable, but when

aggregated make out a cause of action such as a hostile work environment claim.  *Id*.

(internal quotation omitted).  *See McCann v. Astrue*, 293 F. App'x 848, 850 (3d Cir.

2008) ("discrete discriminatory acts that are actionable on their own may not be

aggregated under a continuing violation theory").  Finally, courts are mindful that

"[e]quitable tolling is a rare remedy to be applied in unusual circumstances."

*Wallace*, 549 U.S. at 396.

Here, each time Plaintiff was denied treatment for his RSD he had a cause of

action available to him.  Plaintiff stated that he could have filed a lawsuit in the

1990s, but did not do so.  (*See* Doc. 150 ¶ 4; Doc. 169 ¶ 7; Doc. 175 ¶ 4; Doc. 177 ¶

7; *see also* Doc. 164-1, Ex. 42, Pl. Dep.)  Further, Plaintiff acknowledged his cause of

action in a October 2006 grievance filed with prison officials, categorizing the

officials' conduct as cruel and unusual punishment, as well as deliberate indifference

to his medical needs, both in violation of his Eighth Amendment rights.  (*See* Doc.

163-3 at 3.)  The fact that Plaintiff's medical shower and cane orders were repeatedly

rescinded does not aggregate those discrete acts into a continuing violation. *See Hunt v. Pa. Dept. of Corr.*, 289 F. App'x 507, 509 (3d Cir. 2008) ("[The] continuing conduct of defendant will not stop the ticking of the limitations clock begun when plaintiff obtained [the] requisite information.  On discovering injury and its cause, a claimant must choose to sue or forego that remedy") (quoting *Kichline v. Consol. Rail Corp.*, 800 F.2d 356, 360 (3d Cir. 1986)); *Runkle v. Pa. Dept. of Corr.*, Civ. No. 13-137, 2013 WL 6485344, at * 4-5 (W.D. Pa. Dec. 10, 2013) (finding the plaintiff's claims related to treatment for Hepatitis C that occurred prior to the applicable statute of limitations are barred because repeatedly being denied treatment did not aggregate discrete acts into a continuing violation); *Hairston v. Lappin*, Civ. No. 1:11-CV-1379, 2013 WL 5701637, at *19-20 (M.D. Pa. Oct. 18, 2013) (citing *Ozoroski v. Maue*, 460 F. App'x 94, 96 (3d Cir. 2011) ("Hairston filed an administrative remedy complaining about the medical treatment he was receiving at the prison. . . .  Therefore, at the time, he was aware that he disagreed with his medical treatment and had the facts necessary to put him on notice of the need to investigate his claims of deliberate indifference. . . . [D]efendants' conduct was sufficiently permanent to trigger Hairston's awareness of, and duty to assert, his rights during the limitations period once Hairston filed his administrative remedy on April 22, 2002."(citations omitted)).  As such, Plaintiff's

claims based on conduct that occurred prior to March 19, 2007, are not saved by the continuing violations doctrine and remain barred by the statute of limitations.

The court must now determine whether Plaintiff's claims against the individual Defendants fall within the applicable time period beginning on January 11, 2008, or instead are barred by the statute of limitations. First, with respect to Medical Defendants, based on the record, it is clear that any claims against Defendant Beregovskaya are barred by the statute of limitations because she was no longer employed at SCI-Huntingdon in January 2008, and in fact had left the institution in October 2006. (*See* Doc. 150 ¶ 6.) Because none of Plaintiff's claims from January 11, 2008, to the present implicate Defendant Beregovskaya, summary judgment will be granted in her favor. Further, based on the timing of their documented interaction with Plaintiff, the remaining Medical Defendants, PA Auman and PA Mills, will not be dismissed for reasons relating to the applicable statute of limitations.

Turning to the Corrections Defendants, they first argue in their brief in opposition that the only claims against Defendants Randolph and Albright are based on medical treatment provided to Plaintiff on November 4, 2006, when they responded to Plaintiff's complaints of a medical emergency, and therefore such claims are barred by the statute of limitations. (*See* Doc. 168 at 6.) In his reply brief,

Plaintiff concedes that he has no independent evidence to demonstrate that Defendant Randolph was involved in or interfered with the treatment of his RSD. (Doc. 176 at 6.) Based on Plaintiff's concession relating to personal involvement, as well as the record showing that any claim against Defendant Randolph is barred by the statute of limitations,[8] summary judgment will be granted in favor of Defendant Randolph and he will be dismissed as a party in this action. With respect to Defendant Albright, she also contends that the only claim against her relates to the November 4, 2006 treatment, (Doc. 168 at 6), but Plaintiff counters that she was a participant in the interference with the treatment of Plaintiff's RSD at other times noted in the record, (Doc. 176 at 6-7). Given this dispute, the court will not dismiss Defendant Albright because there is a genuine dispute regarding her involvement in Plaintiff's treatment with the applicable statute of limitations. There appears to be a similar debate with respect to Defendant Showalter, namely whether any claims against her should be barred by the statute of limitations given the undisputed record of the timing of her involvement with the treatment of Plaintiff's RSD. (*See* Doc. 168 at 6-9; Doc. 176 at

---

[8]  Plaintiff's Fourteenth Amendment due process claim against both Defendants Randolph and Albright involves this April 4, 2006 incident, and therefore the claim is barred by the statute of limitations.

6-7.)  As such, the court will not dismiss Defendant Showalter based on the

applicable statute of limitations.

### B.      Exhaustion of Administrative Remedies

 Both sets of Defendants argue that they are entitled to summary judgment

because Plaintiff failed to exhaust his administrative remedies during the applicable

limitations period, as required by the Prison Litigation Reform Act of 1995

("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996).  The court disagrees.

The PLRA requires a prisoner to present his claims through an administrative

grievance process before seeking redress in federal court.  The act specifically

provides as follows:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  A prisoner must exhaust administrative remedies as to any

claim that arises in the prison setting, regardless of any limitations on the kind of

relief that may be gained through the grievance process.  *See Porter v. Nussle*, 534

U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[I]t is

beyond the power . . . of any . . . [court] to excuse compliance with the exhaustion

requirement, whether on the ground of futility, inadequacy or any other basis."

*Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) (quoting *Beeson v. Fishkill Corr. Facility*, 28 F. Supp 2d 884, 894-95 (S.D.N.Y. 1998) (citing *Weinberger v. Salfi*, 422 U.S. 749, 766 (1975)).  The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." *Nyhuis*, 204 F.3d at 71.  The PLRA also mandates that an inmate "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 92 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id*. at 90-91.  Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id*. at 93 (quoting *Nussle*, 534 U.S. at 525).  Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. *See Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004).

A prisoner does not have to allege in his complaint that he has exhausted administrative remedies. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).  Rather, failure to exhaust available administrative remedies is an affirmative defense. *Id*.

43

Therefore, it must be pleaded and proven by the defendants. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002). However, to be clear, "[a] prisoner must exhaust all available administrative remedies before initiating a federal lawsuit." *Lombardi v. Pugh*, Civ. No. 4:05-CV-0300, 2009 WL 1649908, at *3 (M.D. Pa. Jun. 9, 2009) (citation omitted). Further, "the exhaustion requirement is not satisfied if the inmate files an action in the district court prior to completing the administrative remedy process." *Id*. (citation omitted); *see also Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 464 (M.D. Pa. 2010) (stating "most circuit courts are in agreement that a prisoner may not satisfy the PLRA's exhaustion requirement by exhausting administrative remedies *after* initiating suit in federal court") (emphasis in original) (citations omitted).

The Pennsylvania DOC has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the courts of confinement. 37 Pa. Code § 93.9(a); *see also* Pa. Dep't of Corr., DOC Policy No. 804, Inmate Grievance System, *available at* www.cor.state.pa.us/portal/server.pt/community/doc_policies/20643. After an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review. An inmate may then appeal an adverse decision of the Grievance Coordinator to the Superintendent of the institution, and can finally appeal to the Secretary of the

44

DOC Office of Inmate Grievances and Appeals.  *See Booth v. Churner*, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process).

In the instant case, both sets of Defendants argue that Plaintiff has failed to fully and properly exhaust his administrative remedies with respect to his claims. Corrections Defendants argue that Plaintiff failed to file any grievances asserting a denial of medical care during the applicable limitations period ranging from January 11, 2008 through January 11, 2010.  While the record may reflect that Plaintiff did not file a grievance during that time period, it is apparent that SOIGA provided a final decision to Plaintiff's Grievance No. 206309, filed in November 2007, on January 16, 2008.  (Doc. 150 ¶ 143.)  In that grievance, Plaintiff had raised issues relating to his medical showers.  (*Id*. ¶ 141.)  Because Plaintiff had two years to file a federal action from the time he completed his exhaustion process with respect to that grievance,[9] the court finds Corrections Defendants are not entitled to summary judgment on the basis of failure to exhaust administrative remedies prior to filing this federal lawsuit.

---

[9]  Under 42 Pa. Cons. Stat. § 5535(b), "[w]here the commencement of a civil action or proceeding has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action or proceeding must be commenced."  Here, section 1997e(a) prevented Plaintiff from commencing his action until he exhausted his administrative remedies as to the November 2007 grievance.  *See Booth v. Churner*, 532 U.S. 731, 739 (2001) (exhaustion under section 1997e(a) is mandatory).

Medical Defendants also assert that Plaintiff failed to fully and properly exhaust his administrative remedies with respect to claims asserted against them in the applicable limitations period.  Specifically, they argue that, of the grievances filed by Plaintiff on record, theoretically several may identify the individual Medical Defendants, but only Grievance No. 189725, filed in July 2007, was exhausted to final review.  (Doc. 169 ¶ 134.)  Further, that particular grievance was unrelated to the claims made in this action.  (Doc. 149 at 8.)  While the court does note that SOIGA did provide final review of this grievance on October 30, 2007, the review thereof nevertheless falls outside the limitations period.  However, given Plaintiff's history of requests for and/or grievances regarding treatment for his RSD in the form of medical showers and a cane, it cannot be said that Medical Defendants were unaware of Plaintiff's complaints or deprived Plaintiff of the opportunity to address those complaints.  *See Nussle*, 534 U.S. at 524-25 ("Congress enacted § 1997(e)a to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.").  Accordingly, the court finds that Plaintiff's grievance exhausted during the limitations period, *see supra*, was

sufficient to put Medical Defendants on notice of Plaintiff's claims and to satisfy the exhaustion requirement.

### C.   Deliberate Indifference to a Serious Medical Need

Both sets of Defendants also contend that summary judgment should be granted in their favor because Plaintiff has failed to establish that any of them were deliberately indifferent to Plaintiff's serious medical needs.  After a thorough review of the record, the court agrees that all Defendants are entitled to summary judgment on this basis.

A Section 1983 claim based on a violation of the Eighth Amendment's prohibition of unnecessary and wanton infliction of pain arises where prison officials or doctors exhibit deliberate indifference to serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A deliberate indifference claim has two components: an objective component under which the plaintiff must show that denial of care itself was serious or that it had serious consequences; and a subjective component under which the plaintiff must show that the defendant has a sufficiently culpable state of mind.  *See Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).  Further, a serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily

47

recognize the necessity for a doctor's attention." *Mines v. Levi*, Civ. No. 07-cv-1739, 2009 WL 839011, at *7 (E.D. Pa. Mar. 26, 2009) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d at 1017, 1023 (3d Cir. 1991)); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). "[I]f unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment." *Young v. Kazmerski*, 226 F. App'x 191, 193 (3d Cir. 2008) (quoting *Lanzaro*, 834 F.2d at 347).

Deliberate indifference occurs where a defendant: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a prisoner from receiving needed or recommended medical treatment; or (4) persists in a particular course of treatment "in the face of resultant pain and risk of permanent injury." *Rouse v. Allen*, 182 F.3d 192, 197 (3d Cir. 1999). However, "claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Id*. (citing *Estelle*, 429 U.S. at 105); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (finding that if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation);

*Lanzaro*, 834 F.2d at 346 (stating mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim).  In *Estelle*, the Supreme Court held the following:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Estelle*, 429 U.S. at 105-06.

It follows then that inconsistencies or differences in medical diagnoses, short delays unaccompanied by arbitrary or unduly burdensome bureaucratic procedures, and the refusal to summon the medical specialist of the inmate's choice, perform tests or procedures that the inmate desires, or to explain to the inmate the reason for medical action or inaction does not amount to cruel and unusual punishment.  *Runkle*, 2013 WL 6485344, at * 8 (citing *Maqbool v. Univ. Hosp. of Med. & Dentistry of N.J.*, Civ. No. 11-4592, 2012 WL 2374689, at * 9 (D. N.J. Jun. 13, 2012).  As such, allegations that the inmate was provided with medical care, but contentions that the care was "inadequate," fail to state a cognizable claim.  *Runkle*, 2013 WL 6485344, at *8 (citing *Taylor v. Visinsky*, 422 F. App'x 76, 78 (3d Cir. 2011); *see also Jetter v.*

*Beard*, 130 F. App'x 523, 526 (3d Cir. 2005) (noting that while the plaintiff would have preferred a different course of treatment, his preference does not establish an Eighth Amendment cause of action).  Rather, "the decision whether to summon a doctor, like the question of whether a certain diagnostic technique or form of treatment should be prescribed, 'is a classic example of a matter for medical judgment.'"  *McNeil v. Redman*, 21 F. Supp. 2d 884, 887 (C.D. Ill. 1998) (quoting *Estelle*, 429 U.S. at 107).   Accordingly, the deliberate indifference test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'"  *Little v. Lycoming Cnty.*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

In the instant case, throughout the relevant time period, Plaintiff was seen on numerous occasions by various medical personnel at SCI-Huntingdon, as well as outside medical providers, for treatment of his RSD and other conditions.  He was repeatedly evaluated and was prescribed medication, including the medical showers

and use of a cane as needed, to ease his discomfort.  While it is apparent that his

treatment, in particular the use of medical showers and a cane, was modified often,

those modifications were made according to the manner in which Plaintiff presented

himself at the time of examination.  Further, diagnostic tests were ordered and

performed to facilitate such treatment.  Unfortunately, despite all the medical

intervention, Plaintiff continued to suffer from discomfort.  This is clearly a case

where Plaintiff had been given medical attention and was dissatisfied with the course

of treatment and subsequent results.  An inmate's disagreement with medical

treatment is insufficient to establish deliberate indifference.  *Durmer*, 991 F.2d at 69;

*Spruill*, 372 F.3d at 235.  Courts will not second guess whether a particular course of

treatment is adequate or proper.  *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir.

1997).  Moreover, there is nothing in the record demonstrating that any significant

delay in treating Plaintiff's medical condition was deliberate or intentional on the part

of any Defendant.  Under these circumstances and based upon the well-documented

course of treatment set forth in the record, the court finds that all Defendants were not

deliberately indifferent to Plaintiff's serious medical needs.  Thus, Plaintiff has failed

to establish an Eighth Amendment violation.[10]   Accordingly, the motions for summary

judgment will be granted in favor of Defendants.

> ### D.    Supplemental Jurisdiction

Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise

supplemental jurisdiction over a claim" if, *inter alia*, "the district court has dismissed

all claims over which is has original jurisdiction . . . ."  This decision concerning the

exercise of supplemental jurisdiction is left to the sound discretion of the district

court.  *See Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)

(citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  In addition,

when the claim is dismissed by the district court prior to trial pursuant to a provision

such as § 1367(c)(3), "the district court must decline to decide the pendant state

claims unless considerations of judicial economy, convenience, and fairness to the

parties provide an affirmative justification for doing so."  *Id*. (citing *Lovell Mfg. v.

Export-Import Bank of the U.S.*, 843 F.2d 725, 732 (3d Cir. 1988); *Growth Horizons,

Inc. v. Delaware Cnty.*, 983 F.2d 1277, 1284 (3d Cir. 1993)).  The Third Circuit has

also noted that a district court should decline jurisdiction over such claims "where the

---

[10]   Based on this finding, the court concludes that Plaintiff has failed to establish his associated claim of conspiracy against all Defendants for conspiring to interfere with Plaintiff's medical care.

federal claims are no longer viable, absent extraordinary circumstances." *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984) (internal quotations omitted) (citing *Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir. 1982)).

In the instant case, the court will decline to exercise supplemental jurisdiction over Plaintiff's pendant state law claims because his federal claims are no longer viable and extraordinary circumstances do not exist. As a result, Plaintiff's pendant state law claims will be dismissed without prejudice to any right Plaintiff may have to pursue them in state court. In so holding, the court expresses no opinion as to the merits of any such claims.

## IV.   **Conclusion**

For the reasons set forth above, the motions for summary judgment (Docs. 148 & 167) will be granted in favor of Defendants. An appropriate order will issue.

S/SYLVIA H. RAMBO
United States District Judge

Dated: July 24, 2014.